COUNTY OF MILWAUKEE, Plaintiff-Respondent,

v.

SUPERIOR OF WISCONSIN, INC., Defendant-Appellant.
[Case No. 98–2851]

COUNTY OF MILWAUKEE, Plaintiff-Respondent,

v.

FAIRWAY TRANSIT, INC., Defendant-Appellant. [Case No. 98–2897]

COUNTY OF MILWAUKEE, Plaintiff-Respondent,

v.

FAIRWAY TRANSIT, INC., Defendant-Appellant. [Case No. 98–2898]

Court of Appeals

*Nos. 98–2851, 98–2897, 98–2898. Oral argument January 12, 2000.—Decided March 7, 2000.*

2000 WI App 75

(Also reported in 610 N.W.2d 484.)

On behalf of the defendant-appellant Superior of Wisconsin, Inc., the cause was submitted on the briefs of *Joseph P. Duffey* of *Duffey Law Office, S.C.* and *Karen K. Duke* of *Superior Services, Inc.*, Milwaukee. There was oral argument by *Joseph P. Duffey*.

On behalf of the defendant-appellant Fairway Transit, Inc., the cause was submitted on the briefs of *Anthony R. Varda* and *Bradley C. Fulton* of *DeWitt Ross & Stevens S.C.*, Madison. There was oral argument by *Anthony R. Varda*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *E. Michael McCann*, district attorney and *Kent L. Lovern*, assistant district attorney, Milwaukee. There was oral argument by *Kent L. Lovern*. There was a supplemental brief of *James E. Doyle*, attorney general, by *Peter C. Anderson*, assistant attorney general and *Barbara F. Bird*, Department of Transportation, of counsel. There was oral argument by *Peter C. Anderson*.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. WEDEMEYER, P.J. Superior of Wisconsin, Inc. and Fairway Transit, Inc. (collectively "Superior") appeal from a judgment of the circuit court finding both companies guilty of violating overweight permits issued by the Wisconsin Department of Transportation. The dispositive issue in this case involves whether "shredder fluff"—the material that was being transported in the trucks that were cited for weight violations—constitutes "recyclable scrap" as that term is defined in WIS. ADMIN. CODE § TRANS 269.02 (1991).

Because fluff, by both its nature and use in this case, was recyclable scrap, we conclude that the trial court erred in ruling to the contrary. Accordingly, the judgment is reversed.

¶ 2. Superior raises three additional issues: (1) whether the sheriff's department had the authority to issue the citations; (2) whether the trial court erred in ruling that issue preclusion did not apply to bar this litigation; and (3) whether a walking floor trailer meets the statutory definition of "self-compactor equipped vehicle" as that term is used in WIS. ADMIN. CODE § TRANS 269.02(2)(f) (1991). Because the sheriff's department has the authority to issue the citations and because the trial court did not err in deciding that issue preclusion did not bar this matter, we affirm those decisions. Further, we need not reach the "self-compacting vehicle issue" because we conclude that the material involved here constituted recyclable scrap, which need not be transported in a self-compacting vehicle. *See* WIS. ADMIN. CODE § TRANS 269.05(2) (1991); *see Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need to be addressed).

## I.  BACKGROUND

¶ 3. Superior is a corporation engaged in the solid waste disposal business, operating waste-hauling facilities throughout Wisconsin. Sometime prior to April 28, 1997, Superior applied for an overweight permit to move loads of "garbage, refuse and recyclable scrap." The Department of Transportation issued a multiple-trip permit, effective April 28, 1997, allowing a weight up to 120,000 pounds. Without an overweight permit, Superior's weight limitation would have been 80,000 pounds.

¶ 4.    On August 4, 1997, one of Superior's trucks was en route from Miller Compressing Company to the Emerald Park Landfill in Muskego. The vehicle, a tractor-trailer combination, was hauling a material referred to as "shredder fluff." Shredder fluff is the non-metallic portion of the scrap material that remains after the removal of metals from the shredding of automobiles, appliances and similar items. The fluff is used at landfills as "alternate daily cover." At the end of each day, a cover is required to be spread over compacted solid waste at a landfill. *See* WIS. ADMIN. CODE § NR 506.05(1) (1996). Materials used as daily cover include soil, foundry sand, and fluff. *See* WIS. ADMIN. CODE §§ NR 506.05(1) and 506.055 (1996).

¶ 5.    Emerald Park uses and reuses fluff as its daily alternate cover. The fluff is spread over the compacted waste at the end of the day. On each day following, the fluff is scraped back so that it can be reused.[1] Fluff is preferred over soil for several reasons. First, because of its beneficial use, fluff is not taxed by the state. Second, fluff is much lighter than soil and therefore easier and more efficient to work with. Third, fluff is more aesthetic than soil; it does not track in and out of the landfill, is not messy in inclement weather, and is not wind-borne.

¶ 6.    With an annual overweight permit in hand, Superior's vehicle, weighing 106,000 pounds, was transporting fluff to the landfill. A Milwaukee County Sheriff's Deputy issued an overweight citation to the vehicle despite the fact that the overweight permit allowed the truck to haul up to 120,000 pounds of "garbage, refuse and recyclable scrap." The deputy believed

---

[1] Because the solid waste in the landfill is not perfectly level, some of the fluff falls through the cracks into the landfill. As a result, not all of the fluff can be reused.

the overweight permit was being violated because, in his opinion, the fluff was refuse, not recyclable scrap, and refuse must be transported in a "self-compacting" vehicle. The deputy believed that the "walking floor trailer" was not self-compacting.[2]

¶ 7. Superior challenged the citation and the case was tried to the circuit court in July 1998. On September 18, 1998, the court found Superior guilty of violating the overweight vehicle statute. It ruled: (1) the issue preclusion doctrine did not bar prosecution of this case; (2) the sheriff's deputy had the authority to issue the overweight citation; (3) fluff did not constitute recyclable scrap; and (4) the walking floor trailer was not a self-compacting vehicle. Judgment was entered. Superior now appeals.

## II. DISCUSSION

### A. Recyclable Scrap?

¶ 8. The central issue in this case is whether the fluff, beneficially used and reused at the Emerald Park Landfill, constitutes recyclable scrap under WIS. ADMIN. CODE § TRANS 269.02 (1991). The trial court compared the definitions of recyclable scrap and refuse. Recyclable scrap is defined as "metallic or non-metallic material in waste for which there exists a commercially

---

[2] Fairway and All Seasons Trucking, Inc. were also transporting fluff and were similarly issued overweight citations by the same deputy. Fairway, however, was using dump trucks to transport the fluff. Fairway's case, therefore, does not involve the issue of whether the walking floor trailer is a self-compacting vehicle. The cases were consolidated for purposes of trial and appeal. Again, because we conclude that fluff, as it was being used here, constitutes recyclable scrap, the self-compacting issue need not be addressed.

demonstrated processing or manufacturing technology which uses the material as a raw material, and which is transported for use as such a raw material." WIS. ADMIN. CODE § TRANS 269.02(2)(d) (1991). Refuse is defined as "any combustible and non-combustible rubbish including, but not limited to, paper, wood, metal, glass, cloth and products thereof; litter and street rubbish, ashes; and lumber, concrete, and other debris resulting from the construction or demolition of structures." WIS. ADMIN. CODE § TRANS 269.02(2)(e) (1991).

¶ 9. The trial court considered the testimony and concluded that the County proved "by clear and convincing evidence that shredder fluff is not recyclable scrap and is, indeed, refuse." The trial court went on to conclude that the walking floor trailer was not a self-compacting vehicle. Based on these conclusions, the trial court found Superior guilty of violating the overweight permit because it was transporting refuse in a non-compacting vehicle.

¶ 10. Our standard of review is mixed. The resolution of this issue involves interpretation of statutes and regulations, which present questions of law. *See State v. Trudeau*, 139 Wis. 2d 91, 103, 408 N.W.2d 337 (1987). In addition, application of a particular statute or regulation to a given set of facts involves a question of law. *See id.* at 103. Thus, that portion of our review will be done independently. However, review of a trial court's findings of fact are subject to the clearly erroneous standard. *See* WIS. STAT. § 805.17(2) (1997–98).

¶ 11. Our determination depends upon our interpretation of the definition of recyclable scrap found in WIS. ADMIN. CODE § TRANS 269.02(2)(d) (1991). This court may not resort to statutory construction if the

226

statute is clear on its face. *See H.F. v. T.F.*, 168 Wis. 2d 62, 70 n.6, 483 N.W.2d 803 (1992). We interpret administrative regulations in the same manner as we interpret statutes. *See Law Enforcement Standards Bd. v. Village of Lyndon Station*, 101 Wis. 2d 472, 489, 305 N.W.2d 89 (1981). The purpose of interpretation is to determine the intent of the agency that adopted the regulation. *See McGarrity v. Welch Plumbing Co.*, 104 Wis. 2d 414, 425, 312 N.W.2d 37 (1981). We will apply statutory construction to agency rules only if the rule or rules are ambiguous. *See State v. Joerns Furniture Co., Inc.*, 114 Wis. 2d 324, 329, 338 N.W.2d 331 (Ct. App. 1983). A regulation is ambiguous "if 'reasonably well-informed persons could understand it in more than one way,' [if such is the case] the rules of statutory construction 'require us to look at the statutory context, subject matter, scope, history and object to be accomplished.' " *Continental Cas. Co. v. Milwaukee Metro. Sewerage Dist.*, 175 Wis. 2d 527, 531, 499 N.W.2d 282 (Ct. App. 1993) (citation omitted).

¶ 12.   The definition has four parts. To be recyclable scrap, the material must be: (1) "metallic or non-metallic material in waste"; (2) "for which there exists a commercially demonstrated processing or manufacturing technology"; (3) the technology must "use[ ] the material as a raw material"; and (4) the material must be "transported for use as such a raw material."

1.   "metallic or non-metallic material in waste"

¶ 13.   It is undisputed that fluff satisfies the first portion of this definition: it is the non-metallic portion remaining after all the metal is removed from cars, appliances and similar items.

## 2. "for which there exists a commercially demonstrated processing or manufacturing technology"

¶ 14.   The parties dispute whether fluff satisfies the second portion of the definition: whether fluff is used in a commercially demonstrated processing or manufacturing technology. This phrase is not defined within the regulations.

¶ 15.   Superior suggests that the fluff is recyclable scrap because "there exists a commercially demonstrated processing or manufacturing technology which uses the material as a raw material." Superior points to the testimony of Eugene Kramer, the general manager of the Emerald Park Landfill who, by virtue of his education, on-the-job training and postgraduate technical certifications in the solid waste management field, qualified as an expert on the recyclable character of fluff. Kramer testified that the "commercially demonstrated processing technology" involved here is the application of the fluff as daily cover as part of the landfill operations, and the use of it over and over again for that purpose. The process includes scraping back as much fluff as possible at the start of each day so as to reuse it at the end of the day. Superior argues that this process is commercially demonstrated because specific cost and convenience benefits have been identified from using the fluff as daily cover instead of soil.

¶ 16.   The County (and the trial court) proffer plausible interpretations of the phrase "commercially demonstrated processing or manufacturing technology." The County argues that this phrase connotes some sort of physically altering process such as "macerating, mixing and dyeing," or some process producing a chemical change. The attorney general, who participated in the briefing on this appeal, interprets the

language to require an application of a "processing technology to auto shredder fluff to produce a new, reusable material."

### 3. "use[ ] the material as a raw material"

¶ 17. The third portion of the definition, requiring use as a raw material, is also disputed. Although the trial court found fluff was not used as a raw material, that finding is incorrect. The record demonstrates that the County never disputed that fluff was being used as a raw material.

¶ 18. Waiver notwithstanding, this portion of the definition also lends itself to more than one reasonable interpretation. That is, does the term "used" require that the material be used to transform it into a new product, as the dissent suggests; or does the term "used" mean that fluff must be used in its "raw" form, as it naturally exists. The regulation does not require that the raw material be converted by manufacture, processing, or combination into a new and useful product. Rather, the language of the regulation requires the processing of technology to "use[ ] the material as a raw material."

¶ 19. Superior suggests that the process of spreading fluff over the solid waste in the landfill satisfies the "use[ ] . . . as a raw material" requirement of the definition. That is, fluff is being used for a beneficial purpose as a raw material, serving as alternate daily cover at the landfill. The County argues that the technology must use the raw material as an ingredient in a process to make a new product. Both interpretations are reasonable.

### 4. "transported for use as such a raw material"

¶ 20. Finally, the last part of the definition requires that the material be "transported for use as such a raw material." Interpretation of this part of the definition parallels the third part discussed above. There is no dispute that fluff was being transported. The question is again grounded in interpreting the term "use." Is fluff used as such a raw material? The same argument and counter-argument of the parties set forth in part three applies here. There are two reasonable interpretations.

¶ 21. Having concluded that more than one reasonable interpretation of the phrase in the regulation exists, we conclude that the phrase is ambiguous. When ambiguities exist, we interpret the regulation in a manner that promotes the purpose of the statute. *See Tannler v. DHSS*, 211 Wis. 2d 179, 190, 564 N.W.2d 735 (1997). The purpose of the regulation at issue here is to promote recycling. This is consistent with the other regulations tangentially affecting this case as well as the policies of this state concerning recycling, *see* WIS. STAT. § 287.05 (1997–98). *See State v. Aaron D.*, 214 Wis. 2d 56, 66, 571 N.W.2d 399 (Ct. App. 1997) (statutes and administrative regulations on the same subject matter must be construed *in pari materia* and in a manner that harmonizes them in order to give each full force and effect).

¶ 22. WISCONSIN STAT. § 287.05 (1997–98) declares the policies of this state concerning "the reduction of the amount of solid waste generated, the reuse, recycling and composting of solid waste and resource recovery from solid waste." WIS. STAT. § 287.05. These policies include:

(1) [t]hat maximum solid waste reduction, reuse, [and] recycling . . . is in the best interest of the state

in order to protect public health, to protect the quality of the natural environment and to conserve resources and energy.

(2) [t]hat solid waste reduction, reuse, recycling . . . projects should be encouraged in furtherance of these goals.

(3) [t]hat encouragement and support should be given to individuals, collectors, handlers and operators of waste facilities . . . in processing or at the time of disposal in order to facilitate reuse, recycling, composting or resource recovery.

(4) [t]hat research, development and innovation in the design, management and operation of solid waste reduction, reuse, recycling, composting and resource recovery systems and operations are necessary and should be encouraged in order to improve the processes, to lower operating costs and to provide incentives for the use of these systems.

WIS. STAT. 287.05(1)–(4). In addition, the Wisconsin Department of Natural Resources has approved fluff as having a beneficial reuse for recycling purposes as an alternative form of daily cover at the landfill. In this regard, WIS. ADMIN. CODE § NR 500.08(5)(a) provides: "BENEFICIAL REUSE. (a) The department may grant exemptions from the requirements of ch. 289, Stats., for the purpose of allowing or encouraging the recycling of solid wastes." Accepting Superior's interpretation permits harmony among these related provisions.

¶ 23. Here, the evidence is undisputed that the fluff has a beneficial use as alternate cover at the landfill and that the landfill uses and reuses the material to the extent possible. The process of scraping back and reusing the fluff from day to day is an integral part of the operation and construction of the landfill, and has been endorsed by the Wisconsin Department of Natural Resources and the United States Environmental

231

Protection Agency. Wisconsin is on the leading edge in finding a beneficial use for fluff. To this end, Wisconsin provides an information video to other states to encourage the reuse of fluff as daily cover in landfills. Further, use and reuse of fluff promotes preservation of a limited natural resource—soil. Kramer testified that using the fluff as cover also preserves energy because it weighs less than soil. Although the fluff is not being transformed into a new product, the definition of "recyclable scrap," consistent with the statutory goals, does not require such a narrow interpretation. In essence, the fluff is being recycled in the sense that it is being used again for a beneficial purpose. After all, does recycling not also include reusing glass or plastic jars from peanut butter and jelly to hold nails, screws, nuts and bolts or similar items. The jars are being "recycled" without actually being transformed into something new. They are not being discarded, but rather are reused for a beneficial purpose. So is the fluff.

¶ 24.    We conclude that the fluff, as it was used in this case, does constitute recyclable scrap. It is used in the process of disposing of waste; it is not the object of the process. In other words, it is not waste, but rather, is an integral component in accomplishing the process of properly disposing of solid waste at the landfill. It is used and reused for a beneficial purpose. This is consistent with the recycling policies of this state, and such an interpretation is a reasonable construction of the definition of "recyclable scrap." Accordingly, we reverse the judgment of the trial court.

## B.   Sheriff's Jurisdiction.

¶ 25.   Superior also contends that the sheriff's department does not even have jurisdiction to issue overweight citations. Superior clarifies that it does not dispute the authority of the sheriff's department to issue citations when a condition of the permit has been violated, but focuses on the fact that the sheriff's deputy here, in essence, revoked a validly obtained permit based on personal belief that the material being transported was refuse, requiring the use of a self-compacting vehicle.

¶ 26.   Superior argues that the permit involved here specifically authorized the vehicle to weigh up to 120,000 pounds "to move [a] load of: garbage, refuse and recyclable scrap." Superior points out that the vehicle weighed 106,000 pounds and that no conditions of the permit were violated. Accordingly, Superior contends that the deputy should not have issued an overweight citation. Superior reasons that WIS. STAT. § 348.27 authorizes the Department of Transportation to issue annual overweight permits, and that WIS. ADMIN. CODE § TRANS 269.15 authorizes the Department of Transportation to deny, suspend or revoke a permit for stated causes. The argument continues then that, because the Department of Transportation issued the permit and because the weight restriction was not exceeded, the deputy should not have issued the citation. If the deputy believed the fluff was actually refuse requiring the use of a self-compacting vehicle and believed the walking floor trailer did not satisfy this definition, he should have referred the matter to the Department of Transportation. We are not convinced.

¶ 27. Law enforcement officers are granted the authority to enforce laws relating to motor vehicles. *See* WIS. STAT. § 349.02(1) (1997–98) ("It is the duty of the . . . sheriff's . . . departments of every unit of government and each authorized department of the state to enforce chs. 346 to 348 and 350."). WISCONSIN STAT. chapter 348 provides for the issuance of the overweight permits for the vehicles used by Superior. This chapter of the statutes relegates enforcement of overweight regulations, permits "any traffic officer" to stop a suspected violator, *see* WIS. STAT. § 348.19, and provides guidelines for prosecution, *see* WIS. STAT. §§ 348.20, 348.21.

¶ 28. The overweight permit issued to Superior stated that it was "SUBJECT TO CONDITIONS IN CH. TRANS. 251 AND CH. TRANS. 269." WIS. ADMIN. CODE § TRANS 269.14 requires a permit holder to "comply with all applicable statutes, ordinances, rules and policies of any state agency." Here, the deputy believed that fluff was not recyclable scrap. This, as noted above, was a reasonable interpretation of WIS. ADMIN. CODE § TRANS 269.02(2)(d). Accordingly, on that belief, he issued an overweight citation. It turns out that the deputy was in error when he issued the citations because, as we have determined, fluff, as it was used in this case, does constitute recyclable scrap. This does mean that the deputy did not have the authority to issue the citation. Taken in a different context, a deputy has jurisdiction to issue a citation for operating a vehicle while intoxicated if the facts he observes cause him to believe the driver is intoxicated. If the cited driver challenges the citation and subsequently proves he was not intoxicated, the citation will be dismissed.

This does not mean that the deputy did not have authority to issue the citation, but simply that the deputy was wrong. Therefore, we reject Superior's claim that the sheriff's department did not have the authority to issue the overweight citations in this case.

## C. Issue Preclusion.

¶ 29.    Superior also contends that the trial court erred when it denied Superior's motion to bar relitigation of whether a walking floor trailer constitutes a vehicle capable of self-compacting. Superior refers us to a circuit court case wherein the trial court ruled that a walking floor trailer is a self-compacting vehicle. Superior suggests that this ruling should operate to preclude the County from arguing that Superior's walking floor trailer is not a self-compacting vehicle, because the County already litigated and lost on this issue. We disagree.

¶ 30.    "[I]ssue preclusion, is a doctrine designed to limit the relitigation of issues that have been contested in a previous action between the same or different parties." *Michelle T. v. Crozier*, 173 Wis. 2d 681, 687, 495 N.W.2d 327 (1993). We review an issue preclusion challenge subject to the erroneous exercise of discretion standard. *See Ambrose v. Continental Ins. Co.*, 208 Wis. 2d 346, 350, 560 N.W.2d 309 (Ct. App. 1997). In ruling on an issue preclusion argument:

> Courts may consider some or all of the following factors to protect the rights of all parties to a full and fair adjudication of all issues involved in the action: (1) could the party against whom preclusion is sought, as a matter of law, have obtained review of the judgment; (2) is the question one of law that

involves two distinct claims or intervening contextual shifts in the law; (3) do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue; (4) have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; or (5) are matters of public policy and individual circumstances involved that would render the application of [issue preclusion] to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

*Michelle T.*, 173 Wis. 2d at 688–89.

¶ 31. The circuit court case to which Superior refers involved a different defendant, took only one hour of court time, including the decision, which was made after an abbreviated argument by the County and no argument by the defendant, and the County's only witness possessed minimal knowledge regarding walking floor trailers. The County did not appeal.

¶ 32. The trial court contrasted these facts to those in the instant case where the trial took several days, where the witnesses offered more knowledge on these types of trailers, and where a video was shown demonstrating how the trailers work. The trial court concluded that there was a significant difference between the quality and extensiveness of the proceedings in the two cases. Accordingly, the trial court denied the motion, ruling that issue preclusion should not operate to bar relitigation of the walking floor trailer issue. The trial court's decision was reasonable.

*By the Court.*—Judgment reversed.

¶ 33.   FINE, J. *(dissenting)*. This is a simple case. The phrase "raw material" is a common expression in our language and is not ambiguous. In order for something to be a "raw material" it must be used to make something else. Water is a raw material when it is used to make tea; it is not a raw material when it is sprayed on some frolicking youngsters seeking relief from the summer's heat.

¶ 34.   Superior of Wisconsin, Inc., and Fairway Transit, Inc., were found guilty, after bench trials, of operating trucks exceeding the weight limitations imposed by WIS. STAT. § 348.15(3)(c). The trucks were transporting so-called "shredder fluff": fine particles of plastics, cloth, wire, and various non-metallic materials removed from automobiles before they are shredded. Both companies contend that they were exempted from the weight limits by permits issued by the Wisconsin Department of Transportation, and appeal the trial court's conclusion to the contrary. The Majority agrees with the companies. I respectfully dissent.

## I.

¶ 35.   The core facts relevant to these appeals are not disputed. To simplify matters, I analyze the contentions of the parties separately.

A.   *Fairway.*

¶ 36.   The Department issued a permit to Fairway that exempted the company from having to comply with the weight limitations imposed on trucks using Wisconsin's highways. The permit was issued under the authority granted by WIS. STAT. § 348.27(9r):

> The department may issue an annual or consecutive month permit for the transportation of metallic or nonmetallic scrap for the purpose of recycling or processing on a vehicle or combination of vehicles which exceeds statutory weight or length limitations and for the return of the vehicle or combination of vehicles when empty.

WISCONSIN ADMIN. CODE § TRANS 269.05 governs the issuance of permits authorized by § 348.27(9r), and provides: "An issuing authority may issue a permit only for the transportation of garbage or refuse, in a self compactor equipped vehicle or for the transportation of recyclable scrap." WIS. ADMIN. CODE § TRANS 269.05(2).

¶ 37. WISCONSIN ADMIN. CODE § TRANS 269.02(2)(d) defines "recyclable-scrap" as "metallic or non-metallic material in waste for which there exists a commercially demonstrated processing or manufacturing technology which uses the material as a raw material, and which is transported for use as such a raw material." The trial court concluded that the "shredder fluff" carried by Fairway's trucks was not being used as a "raw material" and was thus not "recyclable scrap."

¶ 38. The "shredder fluff" transported by the Fairway trucks is used as landfill cover. The Majority says that this is use as a "raw material." An employee of Superior described the operation for the trial court: "[W]e spread the material 6 inches deep over the waste at the end of the operating day. At the beginning of the next operating day, that dozer operator attempts to remove as much of that material as possible without disturbing the already compacted waste that the material is covering." This covering and uncovering of the landfill with "shredder fluff" is repeated every day that

238

waste material is placed in the landfill. The Superior employee admitted, however, that the "shredder fluff" was not changed in any way—except through natural settling as the result of gravity and spreading. The Vice President of the company providing the "shredder fluff" testified that there was no viable commercial use for the "shredder fluff" other than use as landfill cover.

¶ 39. A trial court's findings of fact may not be set aside on appeal unless they are "clearly erroneous." WIS. STAT. RULE 805.17(2). Moreover, an appellate court must accept reasonable inferences that the trial court draws from the evidence. *See State v. Friday*, 147 Wis. 2d 359, 370–371, 434 N.W.2d 85, 89 (1989). We decide legal issues, including the meaning of statutes and regulations, *de novo. See Truttschel v. Martin*, 208 Wis. 2d 361, 364–365, 560 N.W.2d 315, 317 (Ct. App. 1997). If the language of a statute or regulation is clear, we must apply its plain meaning. *See DNR v. Wisconsin Power & Light Co.*, 108 Wis. 2d 403, 408, 321 N.W.2d 286, 288 (1982).

¶ 40. WISCONSIN ADMIN. CODE § TRANS 269.02(2)(d) is clear. Material is not "recyclable scrap" unless it meets all of the following criteria:

> 1) There must be "a commercially demonstrated processing or manufacturing technology" that "uses the material as a raw material"; and

> 2) The material must be "transported for use as such a raw material."

Merely using the material as it is—either as a landfill cover or for any other use in which it does not undergo change—does not suffice, any more than spraying cool water on hot children makes the water a "raw material" for that use. The "shredder fluff" is not transported for use as a "raw material" in "a commer-

cially demonstrated processing or manufacturing technology"; it is neither processed nor manufactured into something else. *See A & W Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1112 (9th Cir. 1998) ("raw materials, by definition, can't be used in their current state" and must be processed into something else). Thus, in the Majority's example, although peanut-butter jars used to hold nails are being "recycled" for a new use, the jars are not being used as a "raw material," as they would if they were ground down, melted, and reformed into new glass containers. One more example, during oral argument in the case, I pointed out to counsel that there were several dozen tires on a roof of an adjacent building, apparently being used to hold down some roofing material. Presumably, the Majority sees those tires as "raw material" being used as such. I disagree, just as I disagree that the fluff here, which undergoes no change whatsoever and remains fluff forever, is being used as a "raw material" when it is spread on top of landfill debris.[1]

B. *Superior.*

¶ 41. Superior also claims that the "shredder fluff" it carried to the landfill was "raw material," and,

---

[1] As the Majority notes, Fairway contends that the deputy sheriff giving the citations to it for operating its trucks on Wisconsin's highways in excess of the weight limits prescribed by the statutes somehow unlawfully "revoked" the permits issued to it by the Department of Transportation. The permits were not revoked; they did not apply because Fairway's trucks were not transporting "recyclable scrap," for which the permits were issued. Simply put, the permits did not apply because the trucks were not transporting material for which the permits were issued, any more than the permits would have applied if the trucks were carrying beer.

240

moreover, its truck qualified as a "self-compactor equipped vehicle" under WIS. ADMIN. CODE § TRANS 269.05, thus rendering it immaterial whether the fluff was "raw material" or not. My analysis of the "shredder fluff"/"raw material" issue in the Fairway portion of this dissent expresses my views on that issue for Superior as well. Accordingly, I turn to Superior's contentions that its truck was a "self-compactor equipped vehicle." The trial court found that it was not.

¶ 42. As a preliminary matter, Superior contends that the trial court was bound on the issue of whether its type of truck was a "self-compactor equipped vehicle" because a circuit court judge in an earlier case between Milwaukee County and a trucking company other than Fairway or Superior determined that the truck was a "self-compactor equipped" vehicle. Superior seeks to use the doctrine of non-mutual issue preclusion to bind Milwaukee County to the earlier circuit court decision even though Superior could still have relitigated the issue in this case if the other trucking company had lost. Whether the doctrine applies here to do what Superior wishes it to do is a legal matter that we review *de novo. See Gould v. Department of Health & Soc. Servs.*, 216 Wis. 2d 356, 367, 576 N.W.2d 292, 297 (Ct. App. 1998) ("The question whether courts may apply issue preclusion in a particular category of cases is a question of law, which we review independently of the trial court.").

¶ 43. Unlike the application of non-mutual issue preclusion involving private litigants, *see Paige K.B. v. Steven G.B.*, 226 Wis. 2d 210, 594 N.W.2d 370 (1999); *Michelle T. v. Crozier*, 173 Wis. 2d 681, 495 N.W.2d 327 (1993); and *Ambrose v. Continental Ins. Co.*, 208 Wis. 2d 532, 568 N.W.2d 309 (Ct. App. 1997), using the doctrine against a governmental body implicates sig-

nificant and unique public-policy interests. *See Gould*, 216 Wis. 2d at 368–370, 576 N.W.2d at 297–298 ("[T]he 'fundamental fairness' factors of *Crozier* simply do not take into account the significant differences between the government and private parties in litigation.").[2] *Gould* held that a non-appealed decision of a circuit court that reversed a state agency's determination did not bar the state agency from litigating the same issue with another party. Among other reasons, *Gould* noted that application of the doctrine against governmental bodies would force them to abandon their traditional "policy of balancing many factors in deciding whether to appeal adverse rulings, leading to appeals of every adverse decision." *Id.*, 216 Wis. 2d at 369, 576 N.W.2d

---

[2] The " 'fundamental fairness' factors of *Crozier*" to which we referred in *Gould v. Department of Health & Social Services*, 216 Wis. 2d 356, 370, 576 N.W.2d 292, 298 (Ct. App. 1998), were set out in *Michelle T. v. Crozier*, 173 Wis. 2d 681, 688–689, 495 N.W.2d 327, 330–331 (1993), and recently reaffirmed by *Paige K.B. v. Steven G.B.*, 226 Wis. 2d 210, 220–221, 594 N.W.2d 370, 375 (1999):

> (1) could the party against whom preclusion is sought, as a matter of law, have obtained review of the judgment; (2) is the question one of law that involves two distinct claims or intervening contextual shifts in the law; (3) do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue; (4) have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; or (5) are matters of public policy and individual circumstances involved that would render the application of collateral estoppel to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

The last *Crozier* factor, which requires an analysis of public-policy considerations, encompasses the matters recognized by *Gould*, and by me here in concluding that non-mutual issue preclusion should not be applied against Milwaukee County.

at 297–298. Moreover and particularly relevant here, it is not in the public's interest to foreclose forever a governmental body's exercise of its police power because of an adverse, non-appealed decision by a trial-level court. Thus, I conclude, as did the trial court here, that issue preclusion does not apply against Milwaukee County in this case.

¶ 44. Superior's trucks are known as "walking floor trailers" because they use a mechanism with a rib-studded moving belt to unload material. Superior claims that, contrary to the trial court's conclusion, these trucks are "self-compactor equipped vehicles" as that term is used by WIS. ADMIN. CODE § TRANS 269.02(2)(f).

¶ 45. WISCONSIN ADMIN. CODE § TRANS 269.02(2)(f) defines a "self-compactor equipped vehicle" as one that is:

> 1. Specifically designed, constructed and used for the pick-up, transportation, and disposal of garbage, refuse or both; and
>
> 2. Equipped and used with:
>
> a. A blade, plate, or other device that mechanically compacts the load.
>
> b. A separate garbage or refuse container that is designed, constructed, and used with an integral or separate blade, plate, or other device that mechanically compacts the load.

As indicated earlier, Superior's truck is a "walking floor trailer," which has, as found by the trial court, a moving ribbed-floor that is "designed to unload the refuse when the floor is operated in the direction it was intended to be used in, specifically the unload mode." Further, although the trial court found that the "walk-

243

ing floor trailer has the capacity to move the load when run in the reverse direction," "[t]here was testimony that by running the floor in reverse, it would damage the front end of the trailer." Moreover, the trial court credited testimony by persons who had seen the walking-floor trailers loaded "that the load was compacted by the bucket on the front end loader and not by running the floor in reverse." The trial court thus concluded that Superior's walking-floor trailer was not a "self-compactor equipped" vehicle under WIS. ADMIN. CODE § TRANS 269.02(2)(f).

¶ 46.   Although for the reasons already noted earlier in this dissent, the trial court's conclusion that Superior's truck did not fit the definition of a "self-compactor equipped" vehicle is a legal matter that we review *de novo,* its factual findings as to what the truck's mechanisms do or do not do are immune here unless they are "clearly erroneous." Superior has not persuaded me that they are, and, indeed, merely argues that its truck's mechanisms, even as found by the trial court, satisfy the regulation's definition. I disagree. The word "compact" means more than merely "move"—the regulation applies to trucks whose mechanism is designed to and actually does "compact the load[ ]." Here, the mechanism does not compact the load—it moves the load out of the truck. I agree with the trial court's conclusion that Superior's truck is not a "self-compactor equipped" vehicle.

¶ 47.   I would affirm the trial court's cogent analysis of the factual and legal issues in this case.